DAWN WILLIAMS,

       Plaintiff,

    v.

THE UNIVERSITY OF CHICAGO MEDICAL
CENTER,

       Defendant.

No. 11 C 9015

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Dawn Williams alleges that her employer, the University of Chicago Medical Center (the "Medical Center"), retaliated against her by denying her a promotion and creating a hostile work environment, because Williams filed a sexual harassment lawsuit against the Medical Center and one of its doctors, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. R. 1. The Medical Center has moved for summary judgment. R. 43. For the following reasons, the Medical Center's motion is granted.

### Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all

of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

Williams began working as an operating room technician (a position subsequently renamed "surgical technologist") for the Medical Center in October 2002. R. 49 ¶¶ 7-8. In this position, Williams assists the medical staff during various types of surgery, but she specializes in otolaryngology (head and neck) procedures. *Id.* ¶¶ 9-10.

On August 23, 2007, Williams was assigned to work on a urology procedure with Dr. Gary Steinberg. *Id.* ¶ 14. Following the procedure, Williams filed an internal complaint alleging that Dr. Steinberg created a hostile work environment by using threatening and sexually explicit language and made threatening gestures. *Id.* ¶ 15; R. 45-1 at 42-44. The Medical Center investigated Williams's complaint and found that Dr. Steinberg "engaged in angry, inappropriate behavior, but did not substantiate the allegations that Dr. Steinberg used sexually explicit language." R. 49 ¶ 16.

By late July or early August 2009, Williams had applied for various positions at other hospitals. R. 60 ¶ 7. Williams told Dr. Kerstin Stenson—the Medical Center's Director of Head and Neck Surgery, with whom Williams had developed a close working relationship—about her interest in a job with greater responsibility, and Dr. Stenson expressed her hope that Williams would not leave the Medical Center. R. 49 ¶ 11; R. 60 ¶ 8. Williams testified that around that same time in 2009, the interim Director of Perioperative Services, Gayle Eward, spoke with her about creating a new position for Williams. R. 49 ¶ 21. Eward was not an employee of the Medical Center, but worked at the Medical Center under a contract it had with AORN Works, *id.* ¶ 20—a temporary executive nurse employment agency. *See* www.aornworks.com. Williams also testified that later in August 2009, Eward told Williams that Dr. Stenson had informed Eward that Williams had interviewed for other jobs. *Id.* ¶ 22. This prompted Eward to ask Williams "to give her until the end of the year to bring a surgical technician position, lead manager position, into being." *Id.* Dr. Stenson, however, testified that she does not recall ever speaking with Eward. *Id.* ¶ 36. Dr. Stenson also testified that she has attempted to obtain a specialized position for Williams—regardless of whether it would be considered a "promotion" or entail a pay raise—for many years but was unsuccessful due to bureaucratic hurdles and changes in administration. *Id.* ¶ 37. Dr. Stenson does not have the authority to promote Williams or create a new position for her. *Id.* ¶ 38.

Initially, Eward did not tell Williams anything about the position or what its salary or compensation might be, *id.* ¶ 21, but according to Williams, Eward told

her later in August that the position would pay double her then current salary and would entail ensuring that doctors had all of the "equipment and implants" required for a procedure. *Id.* ¶¶ 22-23. Williams did not testify at her deposition that Eward actually offered her a position that Williams could accept, but in an affidavit filed in this case, Williams asserts that Eward offered her a position and Williams accepted it. R. 50-1 ¶ 7. Later in August, Eward told Williams she was "still working on things." R. 49 ¶ 29.

On August 21, 2009, Williams filed a lawsuit against the Medical Center and Dr. Steinberg in Cook County Circuit Court based on the events of August 23, 2007. R. 49 ¶ 18; R. 45-1 at 70-73. The Cook County Circuit Court eventually dismissed Williams's case on April 5, 2010, for failure to serve process on the defendants, R. 49 ¶ 19, although both Dr. Steinberg and the Medical Center retained counsel who made appearances in the case to seek its dismissal. *See* R. 60-1. After she filed the lawsuit in Cook County, Williams sent emails to Eward in October and November 2009 asking about the status of the position Williams alleges she was offered, but Eward never responded. R. 60 ¶ 18.

Williams also testified that Eward told her that she was going to create similar new positions for four other operating room technicians in other specialties, namely: Anita Canto, Rose White, Jennifer Montalvo, and Janice Manik. R. 49 ¶ 25. None of these individuals was promoted to a new position like that described by Eward. *Id.* ¶ 26. In fact, it is undisputed that no operating room technicians received promotions or raises in 2009. *Id.* ¶ 27. Moreover, the Medical Center laid

off a total of 218 employees in February 2009, and there was a hiring freeze in effect at the Medical Center in 2009 and 2010. *Id.* ¶ 28. Nonetheless, despite Williams's admission pursuant to Local Rule 56.1 that there was a hiring freeze in effect at the Medical Center in 2009 and 2010, *id.*, Williams now asserts in the affidavit she filed in this case that she "personally saw schedules where . . . new employees were hired and began orientation throughout 2009 and 2010." R. 50-1 ¶ 12.

It is undisputed that the Medical Center never created a position like the one Williams says Eward described to her. R. 49 ¶ 24. It is also undisputed that Eward had no independent authority to create a new staff position within the Medical Center. *Id.* ¶ 33. Eward left the Medical Center in January 2010. *Id.* ¶ 32.[1]

In addition to being denied a promised promotion, Williams alleges that she suffered other acts of retaliation after she filed her lawsuit in Cook County. In November 2009, Williams was again assigned to work with Dr. Steinberg for the first time since the August 23, 2007 incident. R. 49 ¶ 40. After reporting for the assignment, Williams was told that Dr. Steinberg asked that another technician replace Williams for the procedure, *id.*, and Williams was assigned to a different surgery. *Id.* ¶ 41. Williams did not lose any pay or benefits as a result of being reassigned. *Id.* Williams also testified that later that day, as she passed Dr. Steinberg in the hall, he "bumped [her] thigh with his hand and just continued to walk by." *Id.* ¶ 45. Williams did not report this incident until about a month after it happened. *Id.* ¶ 46.

---

[1] If Eward was deposed, neither party saw fit to include her deposition transcript in the record.

Sometime in 2010, Williams was also assigned to assist during another surgery that Dr. Steinberg attended, but for which he was not the lead surgeon. *Id.* ¶ 67. Williams was relieved of this assignment after working on the procedure for 10 or 15 minutes. *Id.* ¶ 70.

In addition to these incidents with Dr. Steinberg, Williams testified that she was improperly disciplined for lateness and absence from work. Williams was an hour late on February 16, 2010. *Id.* ¶ 48. She was not disciplined for this lateness because it counted as a "freebie" under the Medical Center's attendance policy. *Id.* ¶ 51. Williams was cited for several other attendance policy violations in 2010, but Williams contends that only the February 16 occurrence was retaliatory. *Id.* ¶ 52. Williams also received a warning for an absence in April 2012 after she failed to submit her FMLA paperwork on time. *Id.* ¶ 53. On July 11, 2012, Williams's supervisor, Pat Cook, told Williams that she would be terminated if she continued to miss work. *Id.* ¶ 54. When Williams clarified that she had properly filed FMLA paperwork, the Medical Center admonished Cook for her error. *Id.* ¶¶ 54-55.

Williams also testified that the Medical Center delayed its response to her request for copies of her personal medical records. Williams requested her file from the Medical Center's adult psychiatry department sometime in November 2009. R. 64 at 56 (220:9-18), 57 (221:19-23). She was told it would take three weeks to a month to deliver the file, *id.* at 57 (221:24–222:2), but she received the file sometime in January or February 2010. *Id.* at 57 (222:9-11).

Williams also testified that allegedly retaliatory conduct took place in the context of the Medical Center's accreditation process. During this process on October 7, 2009, the Medical Center's Assistant Director of Perioperative Services, Mary Sejda, announced during a staff meeting that she would be auditing Williams's file along with the file of another nurse. R. 49 ¶¶ 39, 60. Sejda also admonished Williams that she "had better take her job seriously." R. 60 ¶ 22. After that meeting, Cook told Williams that there was a problem with her CPR certification and that her employment could be terminated if her certification was not up-to-date. R. 49 ¶ 61. In fact, Williams's CPR certification was up-to-date. *Id.* ¶ 62.

Williams also testified that during another staff meeting on December 20, 2009, a speaker was providing training on the use of a certain instrument. *Id.* ¶ 65. Sejda asked whether Williams was competent in the procedure being discussed, to which the speaker responded that she was. *Id.*

Williams testified (and confirmed by admitting the Medical Center's assertion of the fact under Local Rule 56.1) that she never told any of her co-workers about the lawsuit she filed in August 2009, and that no one at the Medical Center ever made any comments to her regarding the lawsuit. *Id.* ¶ 74. Nonetheless, Williams now asserts in the affidavit she filed in this case that she told several co-workers about her lawsuit. R. 50-1 ¶ 14. Williams asserts that Dr. Stenson was one of the co-workers she told about the lawsuit. *Id.* Dr. Stenson, however, testified that she was not aware of Williams's lawsuit. R. 45-1 at 120

(55:6-17). Williams also asserts in her affidavit that the surgical technician who informed her that she would be reassigned out of Dr. Steinberg's procedure in November 2009, Janice Manik, asked Williams, with reference to Dr. Steinberg, "[W]hy would you do that to him?" R. 50-1 ¶ 13. Manik held the same title as Williams, and so was not a supervisor. R. 64 at 175:8-12.

In 2011, the Medical Center created a new surgical technologist job classification called "Surgical Technologist III." R. 49 ¶ 13. Williams and several other surgical technologists were promoted to this new position in August 2011, and received corresponding pay increases. *Id.* ¶ 13. This position has a lower salary and less managerial responsibility than the position Williams testified that Eward promised her. R. 45-1 at 18 (87:5-10). Williams remains employed by the Medical Center as a Surgical Technologist III. R. 49 ¶ 2. Williams filed her complaint in this Court on December 20, 2011. R. 1.

## Analysis

Williams alleges that the Medical Center retaliated against her for filing a sexual harassment suit in Cook County Circuit Court by denying her the promotion Eward promised to her. Williams also alleges that the Medical Center created a hostile work environment in retaliation for the lawsuit she filed.

Title VII prohibits an employer from "discriminat[ing] against . . . [the employer's] employees . . . because [the employee] has opposed any practice made an unlawful employment practice [by Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "Title VII generally covers two types of employment discrimination: so-called discrete acts of discrimination, such as . . . failure to promote . . . and acts that create a hostile workplace . . . ." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010) (internal citation and quotation omitted). In order to defeat summary judgment on a retaliation claim under the direct method of proof, Williams must "provide evidence that (1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) there was a causal connection between the two." *Malin v. Hospira, Inc.*, --- F.3d ---, 2014 WL 3896175, at *6 (7th Cir. Aug. 7, 2014).

## I.    Failure to Promote

Williams's filing a lawsuit is protected activity, and "failing to promote an employee is an adverse employment action that can give rise to liability under Title VII." *Malin*, 2014 WL 3896175, at *6. The problem with Williams's argument, however, is that she has not presented any *admissible* evidence to support her allegation that the Medical Center reneged on a promise to promote her to a newly created position. The only evidence Williams submits in support of her failure to promote claim is her own testimony that Eward promised her a promotion to a newly creation position. There is no evidence in the record that Eward has the authority to bind the Medical Center, so her statements cannot be attributed to the Medical Center, and do not fall under the party admission exception to hearsay. Williams admits that Eward did not have the authority to create a new position for

her. R. 49 ¶ 33. Since Eward did not have the authority to create the position she promised to Williams, the statements Williams attributes to Eward were not made "on a matter within the scope" of Ewards's relationship with the Medical Center. *See* Fed. R. Evid. 801(d)(2)(D); *see also Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) ("For an agent's statement regarding an employment action to constitute an admission . . . her duties must encompass some responsibility related to the decisionmaking process affecting the employment action."); *Aliotta v. Nat'l R. R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003) ("[M]any courts, including the Seventh Circuit . . . have held that the declarant must be involved in the decisionmaking process affecting the employment action involved . . . in order for his statements to qualify as having been made within the scope of his employment."). This conclusion is further bolstered by the fact that Eward was not directly employed by the Medical Center, but rather was placed in the position on an interim basis by a temporary employment service, and had left the Medical Center within several months of promising Williams the new position. Thus, summary judgment in the Medical Center's favor on Williams's failure to promote claim is appropriate because the only evidence Williams cites in support of her claim is inadmissible hearsay, which cannot create a genuine question of material fact.[2]

---

[2] In theory, Eward could have provided testimony showing that she had the authority to offer Williams a promotion to a new position. There is, however, no testimony from Eward in the record.

The lack of evidence that Eward had authority to bind the Medical Center in these circumstances also means that the Medical Center cannot be held liable for Eward's statements and actions. Williams admits that Eward did not have the authority to create a new position for her. Since Eward did not have this authority, Eward was not a "decision-maker" for the purposes of deciding whether a new position would be created for Williams. And since Eward was not a decision-maker under these circumstances, the Medical Center cannot be held liable for her failure to create a new position. *See Hall v. Forest River, Inc.*, 536 F.3d 615, 622 (7th Cir. 2008) (the fact that an employee of the defendant questioned the plaintiff about her protected activity was "irrelevant to the question of whether [the defendant] retaliated against [the plaintiff]," because the employee "was not a decision-maker"). Since Eward—and not a Medical Center employee who actually had the authority to create a new position—made promises to Williams, there is no factual dispute as to whether *the Medical Center* (as opposed to Eward) took an adverse employment action against Williams, and summary judgment in the Medical Center's favor is appropriate.

Furthermore, even if Williams had presented admissible evidence indicating that the Medical Center could be held liable for Williams's allegations (which she has failed to do), Williams has presented insufficient evidence to show that her lawsuit caused the Medical Center to decide not to promote her to a newly created position. Williams admits that the position she alleges Eward offered her had not yet been created. Title VII, however, "does not mandate the creation of new

positions." *Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009). And only in "rare cases, [can] the decision not to create a position . . . be discriminatory." *Id.* The only evidence of causation Williams has presented is her own testimony about the timing of Eward's statements prior to the lawsuit Williams filed, and Eward's failure to respond to Williams's emails in the months after Williams filed her lawsuit. "Suspicious timing" can support a claim for retaliation, but "mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012); *see also Hall*, 536 F.3d at 622 ("[T]he mere fact that one event preceded another does not prove causation."). This "is especially true when the claimed retaliation is the failure to promote, because the timing of a promotion is controlled by current or forthcoming vacancies which are beyond an employer's control, unlike firing or other types of retaliatory actions where the timing is in the hands of the employer." *Hall*, 536 F.3d at 622. Here, Williams admits that the position she alleges Eward offered her did not yet exist, and that the Medical Center was in the midst of a hiring freeze.[3] Further, Dr. Stenson testified that her efforts to convince

---

[3] Williams now asserts in her affidavit filed in opposition to summary judgment that "[t]hroughout 2010, new nurses and surgical technicians [were] hired in the perioperative department," and she "saw schedules where these new employees were hired and began orientation throughout 2009 and 2010." R. 50-1 ¶ 12. This assertion comes perilously close to contradicting Williams's admission pursuant to Local Rule 56.1 that a hiring freeze was in effect at the Medical Center during this time period, in which case the Court would disregard Williams's affidavit statement in favor of her admission. *See Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1108-09 (7th Cir. 2004) (affirming the district court's rejection of the plaintiff's

Medical Center decision-makers to promote Williams, or create a new position for her, were frequently stymied by bureaucratic delays and changes in the Medical Center administration. There is no evidence that Eward's failure to secure a promotion for Williams resulted from anything other than similar bureaucratic obstacles. Notably, the Medical Center later promoted Williams to a newly created position, demonstrating that the Medical Center is willing to promote Williams despite the lawsuits she has filed. Williams has failed to "put forth other evidence that suggests that" her lawsuit against the Medical Center was "related to" the Medical Center's decision not to promote her to a new position. *See Hall*, 536 F.3d at 622. Thus, the Medical Center's motion for summary judgment on Williams's failure to promote claim is granted.

## II.  Hostile Work Environment

In addition to her failure to promote claim, Williams alleges that the Medical Center retaliated against her by creating a hostile work environment. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 n.5 (7th Cir. 2004) ("The creation of a hostile work

---

factual assertions which directly contradicted facts the plaintiff had admitted under Local Rule 56.1); *see also Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir. 1988) ("[I]t is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony."). But assuming that Williams means to argue that the hiring freeze was disingenuous, Williams does not claim that the Medical Center hired more new nurses than the 218 employees Williams also admits the Medical Center laid off, meaning there was still a net decrease in employment at the Medical Center during the relevant time period. In any event, even if the Medical Center did hire some new nurses during 2009 and 2010, this does not change the fact that Williams has failed to present any evidence beyond "suspicious timing" that the Medical Center's failure to create a new position for her was caused by her filing of a complaint against the Medical Center.

environment can be a form of retaliation."). Williams contends that the following incidents demonstrate that the Medical Center created a hostile work environment: (1) scheduling her to work with Dr. Steinberg twice after she filed her lawsuit in Cook County against him; (2) Dr. Steinberg "bumping" her thigh with his hand as he passed her in the hall; (3) Sejda's announcement during a staff meeting that Williams's certifications would be audited; (4) Sejda's question to a speaker during a staff meeting asking whether Williams was proficient in a certain medical procedure; (5) delay in production of her personal medical records; and (6) improper discipline of Williams for lateness and absence from work.

## A.    Adverse Actions

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). A "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. "Material adversity" does not include "trivial harms," "petty slights," or "minor annoyances that often take place at work and that all employees experience," because Title VII "does not set forth a general civility code for the American workplace." *Id.*; *see also Stephens*, 569 F.3d at 790. The "significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington*, 548 U.S. at 69; *see also Smith*, 388 F.3d at 567 n.5 ("In evaluating the severity and pervasiveness of the conduct,

[courts must] examine all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

None of the actions Williams complains about were "materially adverse," but instead were "trivial harms," "petty slights," or "minor annoyances." Sejda's comments during the staff meetings regarding whether Williams's certifications were current and whether she was competent in a certain procedure were petty slights that did not lead to any "depriv[ation] of responsibility, hours, pay, or any other relevant accoutrement of her position." *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009). Further, comments made and actions taken with the intent of ensuring that an employee is properly prepared and qualified to perform her job responsibilities are not adverse actions. *See id.* ("In addition to the planning requirements, the plan also obligated [the plaintiff] to 'become more aware of her tone' and to 'work[] on becoming a better listener.' Such minor conditions would not dissuade a reasonable person from exercising her rights."). Even though Sejda made the comments in front of other staff members, the two isolated comments are not part of a pattern of verbal harassment, and were not threatening or abusive. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 982 (7th Cir. 2008) (holding that scolding

an employee for absence by introducing the employee by saying, "This is Amy, you probably haven't met her yet because she is never here," may have been "offensive" to the employee, but was merely a "petty slight" that "does not amount to a materially adverse action"); *see also Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214-15 (10th Cir. 2008) (isolated incidents of co-worker incivility at a meeting, including eye-rolling, laughing at plaintiff's opinions, and commenting behind his back, were not materially adverse). Thus, Sejda's comments are not materially adverse actions.

Williams's testimony about improper discipline for lateness and attendance similarly describes immaterial actions. Williams was not disciplined for her lateness on February 16, 2010, or the Medical Center's initial failure to realize she had taken FMLA leave. Without evidence that she was improperly penalized for lateness or absence, Williams cannot show that the Medical Center took an adverse action against her on this basis. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981 (7th Cir. 2008) ("[The plaintiff] admits that her absences were eventually marked excused and that she was never disciplined for having temporary unexcused absences. So [the plaintiff] has failed to offer evidence that [the defendant] marked her absences unexcused as a penalty for her use of FMLA leave. Summary judgment was proper on her discrimination and retaliation claims.").[4]

---

[4] Williams's testimony about a delay of a month or two in the Medical Center's delivery of her personal medical records is also nothing more than annoying, and certainly does not create a hostile work environment by itself or in concert with the other facts in the record.

Williams's testimony that she was twice scheduled to work with Dr. Steinberg after she filed a complaint against him also fails to describe a materially adverse action such that those scheduling occurrences would dissuade a reasonable person from filing future complaints. Generally, schedule changes at work are not considered materially adverse actions. *See Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) ("[A] transfer—which involved no material change in duties or benefits— was not an adverse employment action . . . ."); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (holding that a transfer to another shift was not an adverse employment action). Williams's argument, however, is not based on the schedule change alone, but the fact that she was initially "scheduled to work with her accuse[d]," and then that her schedule was "subject to the whim of [her] accuse[d][] by having [her] assignment changed at the accuse[d]'s command." R. 51 at 16. Of course, Williams cannot have it both ways. If she alleges that being scheduled to work with Dr. Steinberg was an adverse action, she cannot also allege that Dr. Steinberg taking steps to remedy that situation was an adverse action. In any case, neither action is materially adverse. There is no evidence that these isolated occurrences were anything other than scheduling oversights. Williams admits that she was reassigned relatively quickly, and that she did not suffer any sort of demotion due to these reassignments. While it is undoubtedly unpleasant and uncomfortable for a complainant to encounter the person she accused, these brief encounters cannot be described as anything more than a "trivial harm" or "minor annoyance."

The fact that Dr. Steinberg "bumped" Williams's thigh as they passed each other is "objectionable," since it involved physical contact, but such an isolated incident does not rise to the level of a material adverse action. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007) ("[S]ustained physical contact can raise otherwise merely objectionable conduct to the level of objectively offensive conduct."). Williams has not alleged any other similar incidents with Dr. Steinberg in the more than two years between the date Williams filed her lawsuit in Cook County and the date Williams filed her complaint in this Court. Williams has also failed to present any evidence that Dr. Steinberg intended to touch Williams, let alone intimidate her by doing so. Furthermore, Williams's failure to report the incident until a month later shows that she did not immediately perceive the incident as serious. This isolated incident in the hall is troubling but not materially adverse as there is no evidence that it was intentional or part of a pattern of physical contact.

Williams argues that even if these actions are not materially adverse when analyzed individually, the actions "collectively" add up to a hostile work environment. R. 51 at 10. Certainly the more frequently "objectionable" conduct occurs the more likely it is that the totality of that conduct will create a hostile work environment. If Dr. Steinberg was consistently engaging in physical contact with Williams, or if her supervisors repeatedly threatened her with disciplinary action without cause, isolated incidents that were not individually materially adverse could become actionable. But that does not describe the circumstances Williams

alleges. Williams has emphasized that these incidents happened over a short period of time, *see* R. 51 at 10-11, but that is misleading. Sejda and Cook's comments about the certification audit occurred in October 2009 when the Medical Center was in the midst of the audit process; Williams was assigned to work with Dr. Steinberg and he "bumped" her in November 2009; Sejda asked an instructor whether Williams was qualified in a particular procedure in December 2009; sometime in 2010 Williams was again assigned to work with Dr. Steinberg; and in the Spring of 2012, Cook mistakenly accused Williams of not complying with FMLA policy. This rate of objectionable conduct is not particularly unusual, and certainly not so frequent as to be described as "pervasive" so that it might be actionable. *See Harris*, 510 U.S. at 21. Moreover, while "pervasiveness" of objectionable actions can create a hostile work environment, the actions must also be sufficiently "severe" to dissuade a reasonable person from engaging in protected activity. *Id.* Even if the frequency with which Williams experienced objectionable actions might have been sufficiently great to transform certain actions that would not have been actionable in isolation into a hostile work environment—for instance, intentionally violent or sexual physical contact—the actions Williams experienced do not rise to that level of severity. Due to the low level of severity and relative infrequency of the actions that form the basis of Williams's claim, no reasonable juror could conclude that the Medical Center subjected Williams to a hostile environment.

## B.    Causation

Even if the actions Williams cites as the basis for her claim were materially adverse, Williams must produce evidence "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of [her] employer." *Chaib v. Indiana*, 744 F.3d 974, 987 (7th Cir. 2014). Williams has not produced sufficient evidence of causation. In fact, Williams admits that she told none of her co-workers that she filed suit against the Medical Center, and she does not know whether her supervisors knew she filed suit. R. 49 ¶ 74.[5] Of course, Dr. Steinberg knew about the suit, but Williams does not contend, and there is no evidence in the record, that Dr. Steinberg was responsible for Williams being scheduled to assist with his surgical procedure in the first place. In fact Dr. Steinberg asked that Williams be reassigned, thus remedying the situation about which Williams complains. Williams also now asserts in her affidavit that Manik knew about her lawsuit because she asked, "why would you do that to him?" when she informed Williams that Dr. Steinberg wanted her to be reassigned. R. 50-1 ¶ 13. But Manik was not Williams's supervisor and did not cause Williams to be reassigned. Even if Manik knew that Williams filed a lawsuit against Dr. Steinberg

---

[5] In the affidavit Williams filed in support of her brief in opposition to summary judgment, Williams asserts that she told several of her co-workers and supervisors (including Dr. Stenson and a "manager" named Rita Wilson) about the lawsuit she filed. R. 50-1 ¶ 14. The Court disregards this purported fact because it directly contradicts her prior deposition testimony and admissions under Local Rule 56.1. *See Koszola*, 385 F.3d at 1108-09; *see also United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 466 (7th Cir. 2005) ("Summary judgment would be meaningless if litigants could manufacture genuine issues of material fact through self-serving and unsupported 'admissions' materially different from positions taken in the past.").

and the Medical Center, Manik was not responsible for any of the alleged adverse actions. Since Williams has not presented any evidence that her supervisors or co-workers had knowledge of the lawsuit she filed against the Medical Center, or that they took adverse actions against her because of the lawsuit, the Medical Center's motion for summary judgment on Williams's retaliation claim based on a hostile work environment is granted.[6]

## Conclusion

For the foregoing reasons, the Medical Center's motion for summary judgment, R. 43, is granted, and Williams's claims are dismissed.

ENTERED:

_Thomas M Durkin_
_____
Thomas M. Durkin
United States District Judge

Dated: September 23, 2014

---

[6] Williams also argues that "employees who were similarly situated to Plaintiff . . . were treated more favorably." R. 51 at 16. Even if other similarly situated employees were not subject to the allegedly adverse actions Williams suffered, this does not save Williams's claim. Summary judgment in favor of the Medical Center is appropriate because the actions Williams suffered were not *materially* adverse and Williams has not shown that she was subjected to materially adverse actions *because* she filed a lawsuit against the Medical Center.